UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| THEODORE W. BROWN, | ) | |
|---|---|---|
| Plaintiff, | ) | No. 13 C 7091 |
| | ) | |
| v. | ) | Magistrate Judge Geraldine Soat Brown |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Theodore Brown brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the decision of the Commissioner of Social Security denying his application for Supplemental Security Income under the Social Security Act, 42 U.S.C. § 423. (Compl.) [Dkt 1.] Plaintiff has filed a memorandum in support of summary judgment. (Pl.'s Mem.) [Dkt 23.] The Commissioner has filed a cross-motion for summary judgment [dkt 30] with a memorandum in support (Def.'s Mem.) [dkt 31]. Plaintiff has replied. (Pl.'s Reply.) [Dkt 35.] The parties have consented to the jurisdiction of the Magistrate Judge pursuant to 28 U.S.C. § 636(c). [Dkt 10.] For the reasons set forth below, Plaintiff's motion is granted and the Commissioner's motion is denied.

## PROCEDURAL HISTORY

Plaintiff applied for benefits on February 11, 2011, and the agency denied his claims initially and on reconsideration. (R. 96-99, 106-07, 144-50.) Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ") (R. 110), and that hearing was held on May 7, 2012. (R. 34-74.) On May 15, 2012, the ALJ denied Plaintiff's request for benefits. (R. 19-28.) The Appeals Council

1

declined Plaintiff's request for review (R.1-3), so the ALJ's decision is the Commissioner's final decision. *See Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009).

**BACKGROUND**

Plaintiff was 31 years old when he applied for benefits, alleging that he became disabled in July 2007 because of mental illness, including attention deficit hyperactivity disorder and bipolar disorder. (R. 157, 62.) His previous jobs included short stints as a janitor, donut baker, and fast-food dishwasher, but he had been fired from those positions before they qualified as substantial gainful activity under 20 C.F.R. § 416.971, *et seq*. (R. 21, 164, 187.) He is a high-school graduate. (R. 163.)

**Medical History**

Plaintiff has a history of bipolar disorder and dependence on alcohol and marijuana. (R. 234.) Since at least early 2010, he has received regular treatment at North Central Behavioral Health Systems ("North Central"). (R. 230-38.) In June 2010, Daniel Veronda, a licensed clinical professional counselor at North Central, noted that Plaintiff was "stable and doing well" and was taking BuSpar, an anti-anxiety medication but had stopped taking Tegretol, used to treat neural pain and seizures, because of the side effects. (R. 234-35.)[1] Mr. Veronda stated that Plaintiff had worked

---

[1] BuSpar is a "trademark for preparations of buspirone hydrochloride," which is "an antianxiety agent used in the treatment of anxiety disorders and for short-term relief of anxiety symptoms." *Dorland's Illustrated Medical Dictionary* 265 (32d ed. 2012) [hereinafter *Dorland's*].

Tegretol is a "trademark for preparations of carbamazepine," which is "an anticonvulsant and antineuralgic, used in the treatment of pain associated with trigeminal neuralgia and in epilepsy manifested by tonic-clonic and partial seizures." *Id.* at 287, 1877.

on his anger and depression and "was much improved." (R. 234.)

On January 3, 2011, however, Plaintiff went to the emergency room with concerned family members after he expressed suicidal thoughts. (R. 212.) A urine test revealed the presence of marijuana, which Plaintiff claimed to have recently smoked for the first time in the past three years. (*Id.*) Plaintiff was hospitalized until January 6, and during which, a doctor re-prescribed BuSpar and Tegretol. (*Id.*) On January 6, the doctor observed that Plaintiff showed "no sign of a thought disorder" nor "was he a danger to himself or to others." (R. 213.) Rather, his thoughts were clear and logical, and his insight and judgment were improving. (*Id.*) Plaintiff was discharged with instructions to follow up at North Central. (*Id.*)

The next day, January 7, Dr. Atul Sheth at North Central evaluated Plaintiff. (R. 239-46.) Plaintiff reported to Dr. Sheth that, for several years, he had struggled with bipolar disorder and abused alcohol and marijuana. (R. 239.) Plaintiff stated, however, that he had not smoked marijuana since December 31, 2010, about a week earlier. (*Id.*) He said that he smoked marijuana because "he could not get his medication" and had been off his medication for about a year before his hospitalization. (*Id.*) Dr. Sheth diagnosed Plaintiff with bipolar disorder. (R. 244.) He also assessed Plaintiff's Global Assessment of Functioning ("GAF") score as 51 out of 100. (R. 400.)[2]

In February 2011, Plaintiff began attending group therapy with Mr. Veronda for the first time after having stopped attending group therapy more than a year earlier. (R. 403-06.) On February 10,

---

[2] The GAF scale is "a rating of psychiatric status from 1 (lowest level of functioning) to 100 (highest level), assessing psychological, social, and occupational functioning." *Dorland's* at 1672. A score of 51 to 60 represents moderate symptoms or "moderate difficulty in social occupational, or school functioning"; a score of 41 to 50 represents serious symptoms or a "serious impairment in social, occupational, or school functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th-TR ed. 2000) [hereinafter *DSM IV-TR*].

3

after Plaintiff's first session, Mr. Veronda noted that Plaintiff was "doing much better now" with his renewed prescriptions. (R. 403.) On February 24, Plaintiff received "self medication training" and underwent a psychiatric evaluation. (R. 404.) The doctor completing the evaluation noted that Plaintiff lied that he abstained from drugs during the past year but admitted to sometimes abusing alcohol. (R. 262.) The doctor also observed that Plaintiff complained about his sleep and anxiety but had appropriate affect, speech, memory, and thought content. (R. 260, 264.)

Plaintiff continued treatment at North Central throughout 2011, and Mr. Veronda's notes show that his condition fluctuated. (R. 313-15, 326-29, 370-71, 379-81, 388-91, 403-06.) In March 2011, Plaintiff reported that he was "doing well on this group of medications" and had no mania or anger. (R. 405.) That month, however, Plaintiff's father also completed a function report stating that, although Plaintiff helped around the house with yard work and visits friends a couple of times per week, Plaintiff had a hard time controlling his temper, needed repeated reminders of instructions, and has trouble with stress and authority. (R. 169-75.) In April, Plaintiff stopped attending therapy because of anger about payment for group therapy, though he returned later in the month and reported he was "doing better on the medicine." (R. 388-89.)

On April 28, 2011, Dr. Joseph Mehr assessed Plaintiff's limitations on behalf of the state agency. (R. 78-84.) Dr. Mehr determined that Plaintiff was moderately limited in his ability to understand and remember detailed instructions but was not significantly limited in his ability to understand and remember very short and simple instructions, was free of significant memory impairment, and was "essentially independent in typical activities of daily living." (R. 80.) Dr. Mehr added that Plaintiff had "the cognitive ability to remember general work procedures, and to understand and remember instructions for simple tasks of a routine and repetitive type." (*Id.*) He

4

assessed moderate limitations on Plaintiff's ability to interact with the general public and supervisors, but concluded that Plaintiff's "[p]sychologically based symptoms would not significantly impair his capacity to complete a normal work week." (R. 81.)

The following month, Mr. Veronda noted that Plaintiff was "very angry" because he had been denied disability benefits, and a doctor at North Central recorded that Plaintiff complained of mood swings and that his medication was not working. (R. 278, 380.) Plaintiff's dosage of medication was increased, and he reported "doing a little better." (R. 390.) In June and July, Plaintiff complained of increased anger and difficulty sleeping, and Mr. Veronda noted that Plaintiff remained very angry about "situations in his life," including the denial of disability benefits. (R. 379-81.) In early August, Mr. Veronda observed that Plaintiff was "[m]ore relaxed and talkative than he has been in quite some time and not as angry." (R. 370.) Later that month, however, Plaintiff stopped taking Tegretol, claiming it made him angry to the point where he had recently punched a car and wall. (R. 305.) His doctors changed his drug regimen (switching him to an antipsychotic called Haldol), after which Plaintiff reported in September that he was "doing much better." (R. 370-71.)[3]

On August 28, 2011, a second medical consultant, Dr. Phyllis Brister, examined Plaintiff's medical records. (R. 89.) Her assessment was essentially identical to Dr. Mehr's. (R. 89-94.)

From September to November 2011, Plaintiff repeatedly confirmed during his group therapy sessions with Mr. Veronda that he was "doing well" and that the new medication helped with his

---

[3] Haldol is a "trademark for preparations of haloperidol," an antipsychotic agent "used especially in the management of psychoses and for the control of the vocal utterances and tics of Gilles de la Tourette syndrome." *Dorland's* at 817-18 (32d ed. 2012). Plaintiff also was prescribed Cogentin, a "trademark for preparations of benztropine mesylate," which is used to treat "parkinsonism and for the control of drug-induced extrapyramidal reactions." *Id.* at 209, 382.

5

anger. (R. 313-15, 326-29, 370-72.) He also reported that he remained drug and alcohol free, was getting along better with his girlfriend, and was helping care for his father. (R. 326-29.) His doctors eventually added a prescription for Prozac, which made him calmer. (R. 328.)[4]

Around that same time, Plaintiff completed a functional report about his limitations. (R. 181-88.) He stated that he helps his father around the house and cooks, but has problems staying on task, paying attention, following instructions, handling stress and changes in routine, and working quickly. (R. 181-82, 187.) He said that he mowed and cleaned the yard three times per week, but needed reminders to help him do those things. (R. 183.) His girlfriend did the house work. (R. 184.) He said that he bowled as a hobby, but "not very well" because of his problems with concentration, and that he did not socialize. (R. 185-86.)

On November 28, 2011, Mr. Veronda wrote a letter regarding Plaintiff's claim for benefits. (R. 130.) Mr. Veronda explained that Plaintiff had suffered from a mood disorder all his life and reported symptoms including sleep disturbance, fits of rage, loss of interest in work and leisure activities, feeling of alienation, memory impairment, depression with thoughts of suicide, racing thoughts, mood swings, agitation, inability to concentrate, and feelings of worthlessness and helplessness. (*Id.*) Mr. Veronda added that Plaintiff had a GAF score of 45 and that "[h]is prognosis for recovery is poor and he is definitely unemployable." (*Id.*)

On December 7, 2011, Mr. Veronda noted that Plaintiff indicated during his therapy that he was not sleeping well and felt his medication was "not as effective." (R. 313.) On December 14, 2011, and January 11, 2012, Plaintiff stated that he was "doing well" and that his medication was

---

[4] Prozac a brand name for fluoxetine hydrochloride, which is used to treat depression. *Dorland's* at 722, 1539.

helping, although Mr. Veronda assessed him a GAF score of 47. (R. 304, 314.) On January 18, 2012, Plaintiff reported being "very angry" about his house being crowded. (R. 315.) Mr. Veronda again assessed a GAF score of 47. (R. 361.) Plaintiff returned to being "relaxed and talkative" during his weekly therapy sessions for the rest of January through April 2012. (R. 315, 357-59, 340-41.) On March 14, 2012, a case management note indicated that Plaintiff "[s]eemed in good spirits, oriented, appropriate," and was working on a car for relaxation, taking his dad to the YMCA daily, and working out while there. (R. 358.) On April 25, a week before his administrative hearing, Plaintiff continued to report that he was "doing well." (R. 341.)

**Hearing**

In April 2012, Plaintiff, represented by counsel, testified before the ALJ about his medical conditions. (R. 40-58.) He described living with and caring for his father, who has physical problems, and testified that he helps his father shower, clean the house, cook, wash dishes, grocery shop, and walk the dog. (R. 42, 45, 48-49.) He testified that he tried working before his hospitalization in January 2011 as a cook and dishwasher at a fast-food restaurant but was fired after three months because there was too much stress and he got angry at his manager. (R. 42, 53-54.) He said that he plays videogames and watches television "most of the day." (R. 48-50.) He added that he sees his friends "[o]nce in a great while" because of caring for his father, but had gone fishing with them a couple of times in the past year and participated in a weekly bowling league during the winter. (R. 50-51.) He said that he did not bowl well because his "concentration is real bad now." (R. 51.)

Plaintiff also testified that he regularly consumed marijuana and alcohol before his

hospitalization but had used neither since. (R. 44-45.) He said that his current medications, Haldol and Prozac, sometimes caused him blurry vision and sleeping problems, but also helped him with his mental difficulties. (R. 46, 48.) He had forgotten to take his medication "a couple of times," he admitted, but his father usually reminds him. (R. 49.) He said that his weekly therapy sessions with Mr. Veronda had improved his concentration and anger control, and that the last time his anger got out of control was in the "[m]iddle of last year," when he went out and punched his car. (R. 48, 54-55.) He testified that he still struggles with concentration, finishing tasks quickly, and sleeping. (R. 52, 56-57.)

Plaintiff's father then testified about Plaintiff's limitations. (R. 60-69.) As for Plaintiff's substance use, he said that Plaintiff had nothing more than "an occasional beer on the weekends with his friends but not to an abusive type." (R. 61.) He stated that Plaintiffs helps "[s]omewhat" around the house, but that "it takes a lot of prodding." (*Id.*) He had noticed improvement, however, and although Plaintiff still had occasional fits of rage, he had better control of his anger with his new medication. (*Id.*) He explained that Plaintiff had been arrested two and a half years earlier for threatening to blow up Plaintiff's ex-wife's car. (R. 62.) He also confirmed that Plaintiff has trouble sleeping and finishing tasks. (R. 63, 66-67.)

The ALJ then asked a vocational expert ("VE") about Plaintiff's potential employment. (R. 70-73.) The ALJ asked about the jobs available for a person with Plaintiff's background and no exertional limitations, one episode of decompensation, and moderate restrictions on daily living, social functioning, and concentration, persistence, or pace. (R. 70-71.) The ALJ clarified that these limitations would allow only simple instructions, routine and repetitive tasks, simple work-related decisions, occasional changes in work setting, occasional interaction with supervisors and coworkers,

8

and no interaction with the public. (*Id.*) The VE testified that a person with those limitations could work as a laundry laborer, packager, or garment folder. (R. 70-71.) If, however, Plaintiff had weekly altercations because of his anger, was off-task 30% of the time, or consistently missed three days of work per month, the VE stated that he would not be employable. (R. 72.)

**Disability Determination Process**

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The regulations prescribe a five-part sequential test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. Under the regulations, the Commissioner must consider: (1) whether the claimant has performed any substantial gainful activity during the period for which she claims disability; (2) if she has not performed any substantial gainful activity, whether the claimant has a severe impairment or combination of impairments; (3) if the claimant has a severe impairment, whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe and of such duration as to preclude substantial gainful activity; (4) if the impairment does not meet or equal a listed impairment, whether the claimant retains the residual functional capacity to perform her past relevant work; and (5) if the claimant cannot perform her past relevant work, whether she is unable to perform any other work existing in significant numbers in the national economy. *Id.*; *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001). An affirmative answer at steps one, two or four leads to the next step. *Zurawski*, 245 F.3d at 886. An affirmative answer at steps three or five requires

a finding of disability, whereas a negative answer at any step other than step three precludes a finding of disability. *Id*. The claimant bears the burden of proof at steps one to four, and if that burden is met, at step five the burden shifts to the Commissioner to provide evidence establishing that work the claimant is capable of performing exists in significant numbers in the national economy. 20 C.F.R. § 404.1560(c)(2); *Zurawski*, 245 F.3d at 886.

**The ALJ's Decision**

At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since the alleged onset of his disability. (R. 21.) At step two, the ALJ found that the claimant had two severe impairments: bipolar disorder and a history of abusing alcohol and marijuana in sustained remission since the date of applying for benefits. (R. 21-22.) The ALJ concluded that attention deficient hyperactivity disorder "is not a medically determinable impairment within the meaning of the Regulations." (R. 21.) At step three, the ALJ found that none of Plaintiff's impairments met or equaled the severity of any disability listing, including listing 12.04, for affective disorders, and listing 12.09, for substance-addiction disorders. (R. 22-23.)

At step four, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but was limited to simple instructions, routine and repetitive tasks, simple work-related decisions, only occasional changes in his work setting, no public interaction, and occasional interaction with supervisors and co-workers. (R. 23-24.) The ALJ also noted that Plaintiff had no past relevant work because his short-term positions did not qualify as substantial gainful activity. (R. 25, 27.) Finally, at step five, the ALJ decided that Plaintiff could work in the one of the positions listed by the VE. (R. 28.)

The ALJ discredited Plaintiff's statements about his limitations based on what the ALJ viewed as "inconsistencies." First, the ALJ noted that Plaintiff said during his hospitalization in January 2011 that he had recently used marijuana for the first time in three years, but later admitted that he had been using it weekly since age 15. (R. 25, 299.) Similarly, the ALJ observed, Plaintiff testified that his concentration hurt his bowling, while his father said that Plaintiff bowled "fairly well." (R. 25.) Additionally, Plaintiff reported not socializing, but his father reported that Plaintiff visits his friends a couple of days per week. (*Id.*) Further, the ALJ found the testimony of Plaintiff and his father about Plaintiff's continuing problems with anger inconsistent with group therapy notes showing that "his anger is much better controlled" since his hospitalization. (*Id.*) According to the ALJ, "[t]he only complaint of anger in the records was when his house was overcrowded." (*Id.*) The ALJ did not credit Plaintiff's father's testimony that Plaintiff needs prodding to complete chores, concluding that it was not supported by treatment notes and Plaintiff's other reported activities. (*Id.*) Finally, the ALJ noted that this was Plaintiff's third application for disability benefits and that he had participated in his hearing "closely and fully without being distracted" and responded "to questions in an appropriate manner." (R. 25-26.)

The ALJ also said that the fact that Plaintiff did have a work history at the substantial gainful employment level "negatively affects his credibility." (R. 25.) The ALJ did not explain why that would be so, particularly when Plaintiff's work history indicates that he made a number of attempts at employment.

As for the medical reports, the ALJ decided to give "significant weight" to the opinions of the state-agency medical consultants because "the medical records support that the claimant is free of significant memory impairment and essentially independent in activities." (R. 27.) The ALJ gave

11

little weight to Mr. Veronda's opinion. (*Id.*) She explained that his opinion was "not entitled to controlling weight since he is not an acceptable medical source" and not given "great weight" because it addressed an issue reserved for the Commissioner and was "not consistent with or supported by treatment notes or the claimant's daily activities." (*Id.*) The ALJ also chose not to credit the GAF scores of 47 to 51, most of which were assessed by Mr. Veronda, because, the ALJ said, they were inconsistent with Plaintiff's activities, level of treatment, and response to that treatment. (R. 26.)

## STANDARD OF REVIEW

The Social Security Act provides for limited judicial review of a final decision of the Commissioner. *See* 42 U.S.C. § 405(g). Where the Appeals Council declines a requested review of an ALJ's decision, it constitutes the Commissioner's final decision. *Villano*, 556 F.3d at 561-62. While an ALJ's legal conclusions are reviewed *de novo*, her factual determinations are reviewed deferentially and are affirmed if they are supported by substantial evidence in the record. *Jones v. Astrue,* 623 F.3d 1155, 1160 (7th Cir. 2010); *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Evidence is substantial if it is sufficient for a reasonable person to accept it as adequate to support the decision. *Jones*, 623 F.3d at 1160; *Craft*, 539 F.3d at 673. "Although this standard is generous, it is not entirely uncritical," and the case must be remanded if the decision lacks evidentiary support. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When evaluating a disability claim, the ALJ must consider all relevant evidence and may not select and discuss only the evidence that favors her ultimate conclusion. *See Murphy v. Astrue*, 496 F.3d 630, 634-35 (7th Cir. 2007); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Although

the ALJ is not required to discuss every piece of evidence, the ALJ must provide an accurate and logical bridge between the evidence and the conclusion, so that a reviewing court may assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review. *Craft*, 539 F.3d at 673. "If the Commissioner's decision lacks adequate discussion of the issues, it will be remanded." *Villano*, 556 F.3d at 562.

**DISCUSSION**

Plaintiff argues that the ALJ erred in three ways: (1) failing to analyze his credibility in accordance with Social Security Ruling ("S.S.R.") 96-7p, (2) dismissing the GAF scores in the record, (3) not properly analyzing the opinion of his therapist, Mr. Veronda.

**1.    Plaintiff's Credibility**

Plaintiff first argues the ALJ failed to explain sufficiently the decision to discredit his complaints of disabling mental limitations. (Pl.'s Mem. at 6-13.) As Plaintiff emphasizes, ALJs are required to provide sufficiently specific reasons for discrediting a claimant that are supported by the record. *See* S.S.R. 96-7p, 1996 WL 374186 at *2. To warrant reversal of a credibility determination, Plaintiff must do more than show that the ALJ could have reach a different conclusion; rather, he must show that the determination was so lacking in explanation or support that it was "patently wrong." *Jones*, 623 F.3d at 1162; *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). The credibility finding will only be reversed "if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported." *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006).

13

*Opinions from State Agency Medical Consultants*

Plaintiff first points out that the ALJ failed to mention that the state-agency psychologists both observed that Plaintiff's statements about the intensity and limiting effects of his symptoms were substantiated by the objective medical evidence. (Pl.'s Mem. at 7-8, citing R. 79-80, 90.) Credibility assessments by psychological consultants are specifically addressed in S.S.R. 96-7p:

> Administrative law judges and the Appeals Council are not bound by any State agency findings, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions. Therefore, if the case record includes a finding by a State agency medical or psychological consultant or other program physician or psychologist on the credibility of the individual's statements about limitations or restrictions due to symptoms, the adjudicator at the administrative law judge or Appeals Council level of administrative review must consider and weigh this opinion of a nonexamining source under the applicable rules in 20 CFR 404.1527 and 416.927 and must explain the weight given to the opinion in the decision.

S.S.R. 96-7p, 1996 WL 374186 at *8.

The ALJ did not ignore the consultants' opinions; instead, the ALJ gave "significant weight" to the consultants' conclusion that Plaintiff is not disabled. (R. 27.) The ALJ did not, however, discuss how the consultants' credibility determinations, which support Plaintiff's limitations, figured in to the ALJ's own evaluation of Plaintiff's credibility.

*Plaintiff's Testimony and Daily Activities*

The ALJ's analysis of Plaintiff's testimony and daily activities is also troubling. In particular, the ALJ's remark that "[t]he only complaint of anger in the records was when his house was overcrowded" ignores numerous treatment notes discussing Plaintiff's continuing problems with anger. (R. 25.) In addition to the issue with overcrowding in January 2012, Plaintiff stopped

attending therapy in April 2011 because of anger related to the group, his medication had to be increased when he became "very angry" that he had been denied benefits in May 2011, and he continued to complain of increased anger in both June and July 2011. (R. 379-81, 388-89.) Plaintiff also complained to a doctor at North Central in May 2011 about suffering mood swings, and in August, he reported that he had punched a car and a wall in anger. (R. 305.)

The ALJ never mentioned those treatment notes but instead discussed notes reporting that Plaintiff was "stable" or "doing well." That is not permissible. "An ALJ cannot rely only on the evidence that supports her opinion." *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013). "[W]hile an ALJ need not mention every piece of evidence in her opinion, she cannot ignore a line of evidence that suggests a disability." *Id.* at 1099. That rule applies here, where there are mixed findings about Plaintiff's condition within his treatment record. *See Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (remanding because ALJ "cherry-pick[ed]" doctor's treatment file); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) (remanding when ALJ failed to analyze portions of medical report).

The ALJ's error in overlooking Plaintiff's ongoing complaints of anger is especially significant because of the nature of mental illness. "A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days." *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008). If "half the time she is well enough that she could work, and half the time she is not [t]hen she could not hold down a full-time job." *Id.*; *see also Punzio*, 630 F.3d at 710 ("[A] person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition."). Further, the fact that Plaintiff made improvement is not enough to undermine his allegations of disabling limitations. "Simply because one is characterized as 'stable' or 'improving'

15

does not necessarily mean that she is capable of doing light work" because "[t]he key is not whether one has improved (although that is important), but whether they have improved enough to meet the legal criteria of not being classified as disabled." *Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014). Moreover, because the VE testified that Plaintiff would be unemployable if he regularly acted out in anger at work, the ALJ's disregard of treatment notes about Plaintiff's continuing anger cannot be dismissed as harmless error. *See Punzio*, 630 F.3d at 710 (remanding when ALJ overlooked evidence of claimant's "bad days" that may have made her unemployable according to VE's testimony).

Plaintiff additionally argues that the ALJ erred in relying heavily on Plaintiff's daily activities to discredit him. The Seventh Circuit has repeatedly explained that "although it is appropriate for an ALJ to consider a claimant's daily activities when evaluating their credibility, SSR 96-7p, at *3, this must be done with care" because "a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) (collecting cases). That level of care was not present here. The ALJ was dismissive of Plaintiff's father's comments that Plaintiff needs "a lot of prodding" to complete his chores, and never discussed Plaintiff's report that he needs reminders to complete his chores, takes a long time completing tasks, and sometimes receives help from others in completing housework. (R. 56-57, 182-84.) Similarly, the ALJ discredited Plaintiff because he stated that his concentration problems hurt his bowling when his father testified that Plaintiff bowled "fairly well." (R. 25.) As Plaintiff notes, "[i]t is unclear how these facts contradict one another." (Pl.'s Mem. at 10.) As a result, the ALJ's analysis of Plaintiff's daily activities did not build the necessary logical bridge to explain why Plaintiff's daily activities undermined his

16

testimony about his limitations.

## 2.     GAF Scores

Plaintiff next argues that the ALJ made an improper medical determination when rejecting Plaintiff's GAF scores of 47 to 51.  (Pl.'s Mem. at 13-14.)  A GAF score of 41 to 50 indicates that a person has "serious symptoms . . . or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *DSM IV-TR* at 34 (formatting omitted).  The Seventh Circuit has repeatedly explained that a GAF score of 50 represents a serious impairment on functioning and does not support a conclusion that a claimant is able to sustain work.  *See Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010).

On the other hand, an ALJ is not required to determine the extent of a claimant's disability based entirely on GAF scores.  *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).  That is because GAF scores measure both severity of symptoms and functional level, with the final score reflecting the worse of the two, *not* the clinician's assessment of functional capacity.  *Id.* at 425.  Additionally, the fifth (and most recent) edition of the Diagnostic and Statistical Manual of Mental Disorders abandons "the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'"  *Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (quoting American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013)).  For those reasons, an ALJ's refusal to credit low GAF scores is not enough to undermine a finding of no disability, unless it reflects a more general tendency to ignore or discount evidence favorable to the claimant.  *See Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014); *Bates v. Colvin*, 736 F.3d 1093, 1100 (7th Cir. 2013).

Plaintiff cites seven GAF scores in the record: one rating of 51 from Dr. Sheth shortly after Plaintiff's January 2011 hospitalization, and six ratings of 47 from Mr. Veronda spanning March to December 2011. (Pl.'s Mem. at 13, citing R. 304, 317, 331, 361, 367, 385, 400.) Mr. Veronda also assessed a GAF score of 45 in his November 2011 letter on Plaintiff's behalf. (R. 130.) As discussed, however, Mr. Veronda's treatment notes reflect that Plaintiff's mental condition fluctuated, casting doubt on Mr. Veronda's consistent assessment of 47. As the Seventh Circuit has noted, an "unexplained numerical score" does not undermine narrative findings supporting a determination of no disability. *Denton*, 596 F.3d at 425; *see Warner v. Astrue,* 880 F.Supp. 2d 935, 943-44 (N.D. Ind. 2012) (rejecting argument that claimant's GAF score of 50/45 was evidence that he could not perform unskilled work); *Ingram v. Colvin*, No. 1:13-cv-01081-SLD, 2014 WL 3704816 at *4-*5 (C.D. Ill. July 25, 2014) (affirming ALJ's decision to discount GAF scores as inconsistent with contemporaneous mental-status evaluations). Nonetheless, in light of the ALJ's error in ignoring treatment notes about Plaintiff's continuing problems with anger, the ALJ should reevaluate whether the decision to discredit Plaintiff's consistently low GAF scores is evidence of a larger general tendency to ignore or discount evidence favorable to Plaintiff's claim. *See Yurt*, 758 F.3d at 860.

3.  **Plaintiff's Therapist**

Finally, Plaintiff contends that the ALJ failed to explain why she credited the state consultants over Mr. Veronda's opinion that Plaintiff is "definitely unemployable." (Pl.'s Mem. at 14-18; Pl.'s Reply at 9-10.) Plaintiff concedes that Mr. Veronda is not an "acceptable medical source" under 20 C.F.R. 416.913(a) and thus his opinion may not be used to establish the existence

18

of an impairment. (*Id.* at 14-15, citing S.S.R. 06-03p and 20 C.F.R. 416.927(c).) Nonetheless, Plaintiff points out that the opinions of "other sources," such as therapists, may be used to show the severity of an impairment and how it affects a person's ability to function. *See* S.S.R. 06-03p, 2006 WL 2329939 at *2.

The ALJ gave two reasons for giving little weight to Mr. Veronda's opinion. (R. 27.) First, the ALJ concluded that the opinion addressed an issue reserved for the Commissioner. (*Id.*) Second, the ALJ viewed the opinion as "not consistent with or supported by treatment notes or the claimant's daily activities." (*Id.*)

As Plaintiff points out, the ALJ's first reason for rejecting the opinion is flawed. Although "whether the applicant is sufficiently disabled to qualify for social security disability benefits is a question of law that can't be answered by a physician," the answer to that question "depends on the applicant's physical and mental ability to work full time, and that is something to which medical testimony is relevant and if presented can't be ignored." *Garcia v. Colvin*, 741 F.3d 758, 760 (7th Cir. 2013) (citing *Bjornson v. Astrue*, 671 F.3d 640, 647-48 (7th Cir. 2012); *Ferguson v. Comm'r of Social Security*, 628 F.3d 269, 272-73 (6th Cir. 2010)). Although *Garcia*, *Bjornson*, and *Ferguson* address opinions of treating physicians rather than therapists like Mr. Veronda, the Commissioner has not argued that the situations are distinguishable.

In light of the ALJ's error of ignoring certain treatment notes from Mr. Veronda, the ALJ's second reason is also flawed. The ALJ did not cite any specific treatment note or daily activity that made her question Mr. Veronda's report about Plaintiff's fits of rage, mood swings, inability to concentrate, and racing thoughts. (R. 27.) Rather, as discussed earlier, the ALJ ignored treatment notes revealing that Plaintiff's anger was an oscillating struggle and mistakenly concluded that there

19

was only one complaint of anger in the record. Thus, her decision that Mr. Veronda's opinion was inconsistent with the treatment notes cannot stand. On remand, the ALJ must address the treatment notes that support Mr. Veronda's assessment and document Plaintiff's ongoing difficulties with controlling his anger.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment [dkt 23] is granted, and the Commissioner's cross-motion for summary judgment is denied [dkt 30]. The case is remanded pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. Judgement is entered for the Plaintiff and against the Commissioner.

_____
Geraldine Soat Brown
United States Magistrate Judge

Date: August 28, 2015